## No. 22-1243

In the United States Court of Appeals
for the Sixth Circuit

———————

# United States of America,

Plaintiff-Appellee,

v.

# Yousef Mohammad Ramadan,

Defendant-Appellant.

———————

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 2:17-cr-20595 (Hon. Victoria A. Roberts)

———————

## Brief for the United States

———————

Dawn N. Ison
United States Attorney

William J. Vailliencourt, Jr.
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9626
William.Vailliencourt@usdoj.gov

# Table of Contents

Table of Authorities ................................................................................ iii

Oral Argument Is Unnecessary ............................................................. 1

Issues Presented .................................................................................... 2

Statement of the Case ........................................................................... 3

Summary of the Argument .................................................................... 7

Argument ............................................................................................... 9

I.    None of Ramadan's three convictions violate the Second
      Amendment. There was no error, much less plain error,
      under *Bruen* ................................................................................ 9

      A.    *Heller* and *Bruen* .............................................................. 10

      B.    The Second Amendment does not protect possession of
            a firearm with an obliterated serial number ...................... 14

            1.    Possession of a firearm with an obliterated
                  serial number is not conduct protected by the
                  Second Amendment's plain text. ............................... 15

            2.    Section 922(k) is consistent with the historical
                  tradition of firearms regulation. ............................... 20

      C.    The prohibition on possessing a stolen firearm, 18
            U.S.C. § 922(j), does not affect the rights of law-
            abiding individuals to possess firearms. ........................... 24

      D.    A silencer is not a weapon protected by the Second
            Amendment. ....................................................................... 27

II.    Once the court found that a witness was unavailable to
       testify due to his advanced age and physical condition, the
       court did not commit plain error by not revisiting that
       question at trial. ............................................................... 31

       A.    There was no error. ............................................... 33

       B.    If there was error, it was not so plain or obvious that
             the district court had the independent duty to *sua
             sponte* raise the issue. .......................................... 38

Conclusion ............................................................................ 40

Certificate of Compliance with Rule 32(a) ............................... 41

Certificate of Service ............................................................. 42

Relevant District Court Documents ........................................ 43

# Table of Authorities

## Cases

*Barnes v. United States*, 412 U.S. 837 (1973) ........................................ 25

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................... passim

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) .............. 13, 14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).............. 11, 12, 18, 25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ........................................................... passim

*Puckett v. United States*, 556 U.S. 129 (2009) ....................................... 10

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ........................................... 16

*Stoner v. Sowders*, 997 F.2d 209 (6th Cir. 1993) .............................. 33, 36

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)
    (en banc) ...................................................................................... 20

*United States v. Al-Maliki*, 787 F.3d 784 (6th Cir. 2015)............. 9, 10, 15

*United States v. Bradley*, No. 22-cr-00098, 2023 WL 2621352
    (S.D. W.Va. Mar. 23, 2023) ........................................................... 14

*United States v. Bruce*, 142 F.3d 437 (6th Cir. 1998) ............................ 37

*United States v. Campbell*, 845 F.2d 1374 (6th Cir. 1988)... 34, 35, 36, 38

*United States v. Chavez*, 951 F.3d 349 (6th Cir. 2020)........................... 31

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ...................... 27, 28

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424
    (D. Md. Sept. 20, 2019),
    *aff'd,* 26 F.4th 610 (4th Cir. 2022) ................................................. 28

## Cases

*United States v. Holton*, ___ F. Supp.3d ___, 2022 WL 16701935
(N.D. Tex. Nov. 3, 2022) ...................................................... 14, 20, 23

*United States v. Jacobs*, No. 2:22-cr-160 (C.D. Calif. Nov. 28,
2022) ........................................................................................ 30

*United States v. Lovo-Serrano*, No. 21-CR-398, 2023 WL 1863164
(E.D. N.C. Feb. 9, 2023),
*app. pending*, Case No. 23-4101 (4th Cir.).................................... 14

*United States v. Mallory*, 902 F.3d 584 (6th Cir. 2018).............. 35, 36, 37

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ......... 17, 18, 23

*United States v. McCartney*, 357 F. App'x 73 (9th Cir. 2009) ............... 29

*United States v. Mobley,* 956 F.2d 450 (3d Cir. 1992) ........................... 23

*United States v. Porter*, 886 F.3d 562 (6th Cir. 2018) ...................... 31, 33

*United States v. Price*, ___ F.Supp.3d ___, 2022 WL 4968457
(S.D. W.Va. Oct. 12, 2022),
*app. pending*, Case No. 22-4609 (4th Cir.).................................... 15

*United States v. Ramamoorthy*, 949 F.3d 955
(6th Cir. 2020) ................................................................................ 33

*United States v. Reyna*, No. 21-CR-00041,
2022 WL 17714376 (N.D. Ind. Dec. 15, 2022)............................... 14

*United States v. Royce*, No. 22-CR-130, 2023 WL 2163677
(D.N.D. Feb. 22, 2023).................................................................. 30

*United States v. Saleem*, No. 21-CR-86, 2023 WL 2334417
(W.D.N.C. Mar. 2, 2023)........................................................ 28, 29

*United States v. Serrano*, ___ F.Supp.3d ___,
2023 WL 2297447 (S.D. Cal. Jan. 17, 2023) ...................... 14, 19, 30

iv

## Cases

*United States v. Skouteris*, 51 F.4th 658 (6th Cir. 2022) ........... 10, 32, 38

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ...................................................................... 29

*United States v. Tita*, CR-RDB-21-0334, 2022 WL 17850250
    (D. Md. Dec. 22, 2022) .................................................................. 14

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ........................... 38

*United States v. Woodruff*, 735 F.3d 445 (6th Cir. 2013) ....................... 10

## Statutes

18 U.S.C. § 922(k) ........................................................................... passim

18 U.S.C. § 922(j) ..................................................................... 4, 24, 25, 26

26 U.S.C. § 5861(d) ............................................................................ 4, 30

## Rules

Fed. R. Crim. P. 15 ............................................................................ 4, 33

Fed. R. Evid. 804 ........................................................................... passim

## Other Authorities

2 General Laws of Massachusetts from the Adoption of the
Constitution to February 1822, at 199 (1823) ............................... 21

3 Laws of the Commonwealth of Pennsylvania, from the
Fourteenth Day of October, One Thousand Seven Hundred
240–44 (1810) ................................................................................ 21

Acts and Laws of His Majesty's Province of New-Hampshire: In
New England (1771) (1714 law) .............................................. 25, 26

Laws of the Commonwealth of Massachusetts from
November 28, 1780 to February 28, 1807 (1807) ................... 21, 22

Laws of the State of Maine 546 (1830) ................................................ 22

Laws of the State of New Hampshire; with the
Constitutions of the United States and of the
State Prefixed 277 (1830) ............................................................ 21

Laws of the State of New York Passed at the Sessions of the
Legislature Held in the Year 1785, 1786, 1787 and 1788,
Inclusive 668 (1788 law) .............................................................. 26

The Statutes at Large; Being a Collection of All the Laws of
Virginia from the First Session of the Legislature, in the
Year 1619 (1820) (1730 law) ........................................................ 26

## Publications

David M. Kennedy et al., *Youth Violence in Boston: Gun Markets,
Serious Youth Offenders, and A Use-Reduction Strategy*, 59
Law & Contemp. Probs. 147, 174–75 (Winter 1996) .................... 17

# Oral Argument Is Unnecessary

Although Ramadan challenges the constitutionality of three statutes under the Second Amendment, those challenges are—by his own admission—reviewed only for plain error. And his second issue involving the unavailability of a witness is an unpreserved evidentiary challenge also subject to plain-error review.

Under these circumstances, the facts and legal arguments are adequately presented in the briefs and the record, and "the decisional process would not be significantly aided by oral argument." Fed. R. App. P. 34(a)(2)(C).

# Issues Presented

I.     Federal laws prohibiting the possession of firearms with obliterated serial numbers, the possession of stolen firearms, and the possession of an unregistered silencer all fit comfortably within the Second Amendment framework that the Supreme Court adopted in *Bruen*, and there is no binding precedent holding otherwise. Can Ramadan satisfy his burden of showing plain error when there was no error, much less clear or obvious error?

II.     The district court ruled in a pretrial hearing in November 2019 that a 93-year-old witness was unavailable to travel to testify due to his advanced age and physical condition, making his deposition statements admissible under Federal Rule of Evidence 804. Ramadan now argues that the district court should have revisited that ruling at trial almost two years later, but he never asked the court to do so, and none of the witness's conditions would have improved with age. Did the trial court commit plain error by not revisiting its prior evidentiary ruling *sua sponte* at trial?

# Statement of the Case

Yousef Ramadan was caught trying to smuggle body armor to the Middle East on a passenger flight to Jordan. (R.312: Trial Vol. I, 4795–98; R.41: Evid Hrg., 446–51). After airport security noticed the body armor and other military-type equipment, customs officers interviewed him. (R.312: Trial Vol. I, 4807–16, 4823). During the interview, Ramadan told agents that he had placed some firearms in a self-storage unit, but then later changed his story and said that the guns were at a friend's house. (*Id.* at 4846–50). After investigation uncovered additional evidence, agents located the storage unit and obtained a search warrant for it. (*Id.* at 4859–60, 4866–82).

During execution of the search warrant, agents recovered a Jennings .22 caliber semi-automatic handgun, a Ruger .22 caliber semi-automatic handgun, and a silencer. (*Id.* at 4884–96). Both guns had their serial numbers obliterated. (*Id.* at 4887–4900). Video evidence later connected Ramadan to the theft of the Jennings handgun. (R.316: Trial Vol. V, 5434–36; R.145: Gov't Motion to Admit Testimony, 2458)

Ultimately, a grand jury indicted Ramadan on three counts: possession of a firearm with an obliterated serial number under 18

3

U.S.C. § 922(k); possession of a stolen firearm under 18 U.S.C. § 922(j); and possession of an unregistered silencer under 26 U.S.C. § 5861(d). (R.113: Superseding Indictment, 2278–81).

Phillip Prather owned the firearm that Ramadan had stolen. Because of Prather's advanced age—93 years old at the time—and his limited ability to travel, Ramadan stipulated that these were "exceptional circumstances" that justified deposing him under Federal Rule of Criminal Procedure 15. (R.130: Stipulation, 2347–53). During his April 2019 deposition, Prather then testified that the Jennings handgun was stolen from his California home sometime in 2015, identified checks that he wrote to a carpet-cleaning service, and described the man who cleaned his carpets. (R.145-1: Prather Deposition Tr., 2465–2506). Other evidence identified Ramadan as that man. (R.145: Gov't Motion to Admit Testimony, 2458) (summarizing other evidence connecting Ramadan to Prather's gun).

The parties also questioned Prather about his physical health. (R.145-1: Prather Deposition Tr., 2506). Asked how easy it was for him to get around, Prather said "well -- I don't." (*Id.* at 2507). He could walk only very short distances—a half or quarter block—without needing to

4

stop and rest. (*Id.*). He confirmed that he didn't travel long distances anymore and hadn't been outside California in three years or traveled on an airplane in four or five years. (*Id.* at 2509–10). He couldn't sit down on a plane and he couldn't sleep in hotel rooms. (*Id.* at 2510–11). He had suffered two heart attacks, and he was still on medication after the most recent one in 2011. (*Id.* at 2512).

Afterwards, in August of 2019, the government moved to introduce Prather's videotaped deposition at trial in lieu of his appearance. (R.145: Gov't Motion to Admit Testimony, 2455–2520). Citing Prather's physical condition (*id.* at 2459–60), the government asked the court to find him unavailable under Federal Rule of Evidence 804(a)(4), which permits the admission of prior testimony if the witness "cannot be present or testify at the trial . . . because of . . . a then-existing infirmity [or] physical illness." In addition, Prather's physician wrote that Prather had been diagnosed with spinal stenosis and that he was "limited in his walking capacity as well as his ability to sit in one place." (R.145-2: Exhibit 2 to Motion, 2520).

Ramadan objected, claiming that there was "minimal evidence" that Prather was unavailable to testify at trial. (R.150: Ramadan

5

Response, 2541). He argued that it was mere inconvenience that did not "rise[] to the level of unavailability." (R.309: Motion Hrg. Tr., 4641).

The district court granted the motion in November 2019, noting that "inconvenience is not the standard," and finding that "it would be detrimental to his health if he could make it at all" and "that it is not possible for him to come." (R.309: Motion Hrg. Tr., 4643–44; R.167: Opinion and Order, 2638).

Two years later, after some delays caused by the Covid-19 pandemic, Ramadan proceeded to trial in September 2021. He did not ask the district court to revisit its previous evidentiary ruling or suggest that Prather's circumstances might have changed in the intervening two years. And after a six-day trial, a jury convicted Ramadan of all three counts. (R.270: Verdict Form, 4084–85). Noting that Ramadan served 41 months in pretrial detention before being released on bond, and with a sentencing guideline range of 63–78 months, the court sentenced him to time served and two years of supervised release. (R.300: Sentencing Tr., 4497, 4501–02; R.299: Judgment, 4427–29).

Ramadan timely appealed. (R.301: Notice of Appeal, 4511).

6

# Summary of the Argument

Ramadan challenges each of his three convictions—possession of a firearm with an obliterated serial number, possession of a stolen firearm, and possession of an unregistered silencer—as unconstitutional under the Second Amendment and the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Because Ramadan failed to make those challenges in the district court, they are reviewed for plain error. The statutes under which Ramadan was convicted all pass muster under the test that the Supreme Court set forth in *Bruen*, so he cannot show any error at all. And in any event, no Sixth Circuit or Supreme Court decision has held any of those statutes unconstitutional, preventing Ramadan from showing any error that is clear or obvious.

The district court also did not commit plain error in not revisiting its previous evidentiary ruling *sua sponte* at trial. The district court had previously found that the physical infirmities of a 93-year-old witness prevented him from traveling cross-country to testify at trial, and the court had permitted the introduction of his videotaped deposition under Federal Rule of Evidence 804 on that basis. At no time before or during

trial, almost two years later, did Ramadan ever ask the court to reconsider its previous determination or suggest that the witness's health had improved in the intervening months. Because circuit precedent does not require a judge to conduct a new hearing to determine if there has been a miraculous rejuvenation of a witness previously found to be unavailable, Ramadan fails to establish plain error.

# Argument

## I.     None of Ramadan's three convictions violate the Second Amendment. There was no error, much less plain error, under *Bruen*.

Ramadan claims each of his three convictions are invalid because they involve conduct protected by the Second Amendment, citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). But because Ramadan, as he concedes, failed to raise these issues in the district court, review is for plain error. *United States v. Al-Maliki*, 787 F.3d 784, 791 (6th Cir. 2015). Ramadan must show error that is obvious or clear, that affected his substantial rights, and that affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* Because enforcing "an obviously unconstitutional statute" affects both substantial rights and the fairness, integrity, or public reputation of judicial proceedings, "the key questions here are whether there was any error (is the statute unconstitutional?), and if so, whether that error was plain (is the statute 'obviously or clearly' unconstitutional?)." *Id.*

As to the first question, the statutes are constitutional. And the second question, whether the claimed error is clear or obvious, presents an insurmountable hurdle for Ramadan to overcome given the absence

of binding authority addressing these statutes under the Second Amendment. As this Court has explained, "[a]n error is 'plain' when, at a minimum, it is 'clear under current law,'" *Al-Maliki*, 787 F.3d at 794, and not "subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). "A circuit split precludes a finding of plain error," as does "a lack of binding case law that answers the question presented." *Al-Maliki*, 787 F.3d at 794; *United States v. Skouteris*, 51 F.4th 658, 673 (6th Cir. 2022) (citing *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013)).

### A.    *Heller* and *Bruen*

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. *Heller* said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures." *Id.* at 626–27 n.26.

10

In *Bruen*, the Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156. But, as Justice Kavanaugh emphasized in concurrence (joined by the Chief Justice), "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). Justice Alito likewise echoed the point that *Bruen* does not "disturb[] anything that [the Court] said in *Heller* or *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010)] . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring).

*Bruen* rejected the two-step Second Amendment framework adopted by most courts of appeal after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125–26. Under that two-step framework, courts had first engaged in a historical inquiry to

11

determine whether the conduct at issue fell within the scope of the Second Amendment. *Id*. at 2126. If so, then courts had examined how close the regulation came to the core Second Amendment right and the severity of the burden on that right by applying varying levels of scrutiny. *Id*. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127. But the Court rejected the second step, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. at 2126–27.

*Bruen* clarified the "standard for applying the Second Amendment." *Id*. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2129–30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.

*Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the

Founders in 1791." *Id.* at 2132. When considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33 (quotation marks omitted). Thus, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when in engaging in an analogical inquiry." *Id.* at 2133 (emphasis and quotation marks omitted).

The Court emphasized that this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue.'" *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a

13

historical *twin.*" *Id.* (emphasis in original). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

### B.  The Second Amendment does not protect possession of a firearm with an obliterated serial number.

Ramadan's challenge to his conviction under 18 U.S.C. § 922(k), for possessing a firearm with an obliterated serial number, should begin and end with the standard of review. Since *Bruen*, no court of appeals has addressed the constitutionality of 18 U.S.C. § 922(k). Nor has the Supreme Court. So far, six district courts to have done so have held it constitutional. *See United States v. Bradley*, No. 22-cr-00098, 2023 WL 2621352 (S.D. W.Va. Mar. 23, 2023); *United States v. Lovo-Serrano*, No. 21-CR-398, 2023 WL 1863164, *6 (E.D. N.C. Feb. 9, 2023), *app. pending*, Case No. 23-4101 (4th Cir.); *United States v. Serrano*, ___ F.Supp.3d ___, 2023 WL 2297447, *11–13 (S.D. Cal. Jan. 17, 2023); *United States v. Tita*, CR-RDB-21-0334, 2022 WL 17850250, *5–8 (D. Md. Dec. 22, 2022); *United States v. Reyna*, No. 21-CR-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022); *United States v. Holton*, ___ F. Supp.3d ___, 2022 WL 16701935, at *4–5 (N.D. Tex. Nov. 3, 2022). Only one district court has found that provision to be unconstitutional and

14

that ruling is presently pending before the Fourth Circuit. *See United States v. Price*, ___ F.Supp.3d ___, 2022 WL 4968457 (S.D. W.Va. Oct. 12, 2022), *app. pending*, Case No. 22-4609 (4th Cir.).

That there is no binding authority addressing this question, and the district courts have, with only one exception, uniformly held that § 922(k) is constitutional demonstrates that this can't be *plain* error as this Court explained in *Al-Maliki*. And that's as far as this Court needs to go. But even on the merits, there is no error because the statute is constitutional.

### 1. Possession of a firearm with an obliterated serial number is not conduct protected by the Second Amendment's plain text.

Under *Bruen*, the first question is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. But that plain text cannot be read in isolation. "[T]he Second Amendment . . . codified a pre-existing right." *Heller*, 554 U.S. at 592. And that right should not extend to possession of a firearm with an obliterated serial number because such a firearm is not "typically possessed by law-abiding citizens for lawful purposes," *id*. at 625; nor is it necessary to protect the right to self-defense.

15

*Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Thus, *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

*Heller* outlined several limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment. *Heller*, 554 U.S. at 626. It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. And, as "another important limitation on the right to keep and carry arms," the

16

Court said that the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id*. at 627. Thus, *Heller* said, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625.

Possession of a firearm with an obliterated serial number is not protected by the Second Amendment's plain text for at least two reasons. First, firearms with obliterated serial numbers are not "typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625. As the Third Circuit has observed, "we . . . cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm." *United States v. Marzzarella*, 614 F.3d 85, 99 (3d Cir. 2010); *see* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174–75 (Winter 1996) (observing that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase). Thus, § 922(k)'s burden "will almost always fall only on those intending to engage in illicit behavior." *Marzzarella*, 614 F.3d at 99.

17

Second, § 922(k)'s prohibition does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the central component' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). But "the presence of a serial number does not impair the use or functioning of a weapon in any way." *Marzzarella*, 614 F.3d at 94. A person desiring to defend himself can easily do so with either a serialized firearm or a pre-1968 or privately made firearm lacking a serial number. Such firearms are far more common and easier to obtain than those with obliterated serial numbers.

Any burden that § 922(k) imposes on the right to self-defense would be even less burdensome than other regulations that *Bruen* indicated do not infringe on that right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" licensing schemes that existed in 43 states. *Bruen*, 142 S. Ct. at 2138 n.9. The Court explained that

"these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 922(k)'s ban on possession of firearms with obliterated serial numbers—a small class of hard-to-obtain firearms—is similarly constitutional because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

As one district court recently concluded in finding that the Second Amendment does not cover § 922(k), "[a] law requiring that firearms have serial numbers simply does not infringe a law-abiding citizen's right to keep and bear arms for self-defense and other lawful purposes." *Serrano*, 2023 WL 2297447, at *11. Because "firearms of similar make

19

and model are essentially fungible, and 'the presence of a serial number does not impair the use or functioning of a weapon in any way, ... a person is just as capable of defending himself with a marked firearm as with an unmarked firearm.'" *Id.* (quoting *Holton*, 2022 WL 16701935, at *4).

### 2. Section 922(k) is consistent with the historical tradition of firearms regulation.

Even if the conduct regulated by § 922(k) was protected under the Second Amendment's plain text, the statute is constitutional because it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Section 922(k) is analogous to historical laws regulating firearms and gunpowder—most notably laws prohibiting alteration of proof marks on gun barrels.

Well before serial numbers became common, colonial and state legislatures regulated firearms and the firearms trade. *See Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc) ("[C]olonial governments substantially controlled the firearms trade."). Additionally, several states had laws relating to the inspection and marking of gunpowder. Gunpowder was essential to the operation of firearms at that time, so gunpowder regulations directly affected the

use of firearms for self-defense. In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting the transfer of any unmarked gunpowder. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240–44 (1810). In 1809, Massachusetts required the inspection and marking of all gunpowder locally manufactured or stored in a public magazine. 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823). That law imposed a fine on any person who "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.* New Hampshire adopted a similar law in 1820. Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. In 1805, Massachusetts required provers to "stamp" the barrel with their initials and the year. *See* Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259–60 (1807). The act also imposed a fine for

21

selling, delivering, or purchasing any unmarked musket or pistol manufactured in the Commonwealth. *Id.* at 260–61. Maine passed a similar statute in 1821 requiring provers to permanently mark the barrels of new firearms. *See* Laws of the State of Maine 546 (1830). The statute further imposed a fine on any person who offered for sale or sold "any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id.* Additionally, it imposed a fine on any person who falsely altered the stamp or mark. *Id.*

These statutes are "relevantly similar" to § 922(k). *Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original). The ultimate question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. Section 922(k) imposes an almost non-existent "burden on the right of armed self-defense" because marked firearms are ubiquitous and just as effective for self-defense as unmarked firearms. That burden is nearly identical to, and certainly no greater than, the burdens imposed by historical laws relating to the sale and marking of firearms and

22

gunpowder. And neither the historical laws nor § 922(k) deprived citizens of the use of firearms for self-defense. *See Holton*, 2022 WL 16701935, at \*5 (observing that "[*n*]*ot removing* the serial number from a firearm" is a "negligible burden" compared to historical restrictions on firearm possession).

Section 922(k) also imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133. The laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. Section 922(k) serves similar purposes by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime. *See Marzzarella*, 614 F.3d at 98; *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir. 1992).

Because 18 U.S.C. § 922(k) does not violate the Second Amendment, Ramadan fails to demonstrate error, much less plain error. His conviction should be affirmed.

C.    **The prohibition on possessing a stolen firearm, 18 U.S.C. § 922(j), does not affect the rights of law-abiding individuals to possess firearms.**

Under *Bruen*'s textual inquiry, the Second Amendment's "plain text" does not cover the possession of stolen firearms, as prohibited by 18 U.S.C. § 922(j). The Amendment protects the right "to keep and bear arms," but that right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626 (2008).

Nothing in the Amendment's text or history suggests that it protects the right to keep *stolen* firearms. Governments have long prohibited theft and the possession of stolen property. The right to "keep and bear" arms does not include a right to possess firearms that belong to someone else. Section 922(j) does not *infringe* on a law-abiding citizen's Second Amendment rights; it actually *protects* those rights by imposing a penalty on those who would prevent the lawful owner from possessing their firearm.

Even if a firearm's stolen status did not remove it from the Second Amendment's purview, § 922(j)'s prohibition does not "infringe" on the central right protected by the Second Amendment: the right to armed

24

self-defense. *Heller* "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599).

Section 922(j) does not disarm anyone. It simply prohibits individuals from possessing *stolen* firearms. Law abiding citizens can more easily acquire firearms that have not been stolen through normally accepted methods of commerce; the statute merely limits the trade of illegally acquired weapons.

Even if the conduct prohibited by § 922(j) was somehow protected by the Second Amendment's text, the statute is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Under the common law, a person in possession of stolen goods could be convicted of larceny based on the common-law inference that "guilty knowledge may be drawn from the fact of unexplained possession of stolen goods." *Barnes v. United States*, 412 U.S. 837, 843–44 (1973).

Beyond this common-law principle, a number of colonies and early states enacted statutes punishing the possession of stolen goods. *See, e.g.*, Acts and Laws of His Majesty's Province of New-Hampshire: In

New England 39-40 (1771) (1714 law); The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619, at 273 (1820) (1730 law); Laws of the State of New York Passed at the Sessions of the Legislature Held in the Year 1785, 1786, 1787 and 1788, Inclusive 668 (1788 law).

Although these statutes applied more broadly to the possession of stolen goods, they clearly applied on their face to the possession of stolen firearms. And the undisputed authority of legislatures to prohibit the possession of stolen goods necessarily included the power to prohibit the possession of stolen firearms.

The Second Amendment does not protect the conduct criminalized by § 922(j), and Ramadan cannot demonstrate error. And given the lack of *any* binding authority that § 922(j) suffers from any constitutional infirmity, Ramadan fails to show any clear or obvious error. Accordingly, his conviction for violating 18 U.S.C. § 922(j) should be affirmed.

### D.    A silencer is not a weapon protected by the Second Amendment.

Finally, Ramadan claims his conviction for possessing an unregistered silencer violates the Second Amendment. Again, Ramadan fails to demonstrate error, much less error that is plain or obvious under binding authority.

Ramadan fails to satisfy *Bruen'*s first hurdle: that his conduct falls within the plain text of the Second Amendment. The Second Amendment, by its plain terms, protects the right to keep and bear "arms." As *Heller* noted, the "most natural reading" of the Second Amendment's right to keep and bear arms is the right to "have weapons." *Heller*, 554 U.S. at 582.

A silencer is not a firearm and falls outside the scope of the Second Amendment. As the Tenth Circuit explained in *United States v. Cox*, the Second Amendment covers "[w]eapons of offence, or amour of defence" or "any thing that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another." 906 F.3d 1170, 1186 (10th Cir. 2018) (citing *Heller*, 554 U.S. at 581). But "[a] silencer is a firearm accessory; it's not a weapon in itself." *Id*. And

because of that, "it can't be a 'bearable arm' protected by the Second Amendment." *Id*.

One district court explained that "[a] silencer is not itself used 'to cast at or strike another,' it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd,* 26 F.4th 610 (4th Cir. 2022). As that court noted, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm." *Id*. Accordingly, "[a] silencer is not a weapon in and of itself, but simply a 'firearm accessory.'" *Id*. (citing *Cox*, 906 F.3d at 1186). While a silencer "could be thrown at someone like a shoe or a baseball," it is *not*, however "a 'bearable arm' protected by the Second Amendment." *Id*., and at n.5.

Following *Hasson*, in one of the most thorough opinions to date, another district court determined that "because [silencers] are not independently operable and do not serve any central self-defense purpose," they are "not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection." *United States v. Saleem*, No. 21-CR-86, 2023 WL 2334417,

at *9 (W.D.N.C. Mar. 2, 2023). Moreover, silencers are not "reasonably necessary accoutrements that render a firearm useful and functional." *Id.*, 2023 WL 2334417 at *10. Rejecting the notion that silencers were like cleaning equipment and bullets, the court observed that while "silencers enhance the user's experience, … they are not necessary to make a firearm useful or functional, and as such are not protected by the plain text of the Second Amendment." *Id.*, and at n.7.

Alternatively, that court further noted that a silencer also falls outside the scope of the Second Amendment because it is a "dangerous and unusual" instrument. *Id.*, 2023 WL 2334417 at *11; *see also United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (because silencers are uncommon and "not typically possessed by law-abiding citizens for lawful purposes," they are not protected by the Second Amendment under *Heller*). As the court explained, "by including silencers within the [National Firearm's Act's] ambit … Congress determined silencers are 'modern and lethal weapons' that are 'likely to be used for criminal purposes.'" *Saleem*, 2023 WL 2334417 at *11, quoting *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992).

Moreover, § 5861(d) does not prohibit the possession of silencers; it merely prohibits the possession of *unregistered* silencers. Ramadan undertakes no analysis whatsoever to claim that the licensing regime regulating silencers violates the Second Amendment. And *Bruen* doesn't help him. Unlike the rejected regulatory scheme in *Bruen*, § 5861(d) does not require "demonstrating to government officers some special need" to possess a silencer. Order Denying Motion to Dismiss at 234, *United States v. Jacobs*, No. 2:22-cr-160 (C.D. Calif. Nov. 28, 2022), ECF No. 28 (citing *Bruen*, 142 S. Ct. at 2156). It just requires registering it.

To our knowledge, not a single court has held that 26 U.S.C. § 5861(d)'s prohibition of unregistered silencers is unconstitutional under *Bruen*. The judicial landscape is a consistent one. Silencers fall outside the scope of the Second Amendment because they are not "arms." *See, e.g., United States v. Royce*, No. 22-CR-130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) (a silencer is not a firearm or other bearable arm protected by the Second Amendment); *United States v. Serrano*, ___ F.Supp.3d ___; 2023 WL 2297447, *13–14 (S.D. Calif. Jan 17. 2023) (prohibition of possession of unregistered silencers does not regulate conduct protected by the Second Amendment).

30

Because Ramadan fails to demonstrate error, much less plain error, from his conviction for possessing an unregistered silencer, his conviction should be affirmed.

## II.   Once the court found that a witness was unavailable to testify due to his advanced age and physical condition, the court did not commit plain error by not revisiting that question at trial.

Generally, a decision to admit evidence is reviewed for an abuse of discretion. *United States v. Chavez*, 951 F.3d 349, 357–58 (6th Cir. 2020). This means asking "whether the district court (1) misunderstood the law (here, the Federal Rules of Evidence), (2) relied on clearly erroneous factual findings, or (3) made a clear error of judgment." *Id.* at 358. "An abuse of discretion occurs when the reviewing court is left with the definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Porter*, 886 F.3d 562, 566–67 (6th Cir. 2018) (abuse-of-discretion standard applies to a decision to admit deposition testimony at trial).

But Ramadan did not preserve the issue that he now raises on appeal: whether the district court should have reevaluated Prather's unavailability as a witness at trial, after the court had previously found that Prather's age and physical condition rendered him unavailable.

31

In March 2019, the parties stipulated to depose Philip Prather in San Diego, California. He was 93 years old at the time and had a limited ability to travel. (R.130: Stipulation, 2347–53). After the deposition, the government moved in August 2019 to admit the video deposition in lieu of live testimony under Federal Rule of Evidence 804(a)(4) because Prather was unavailable due to his physical condition. (R.145: Gov't Motion to Admit Testimony, 2455–2520). Ramadan objected (R.150: Defendant's Response, 2540–45), but the court granted the motion finding that Prather was unable to travel. (R.309: Motion Hrg. Tr., 4643–44; R.167: Opinion and Order, 2638).

At no time before the case was tried in September of 2021, did Ramadan ever ask the court to reconsider its unavailability determination or claim that Prather's condition had improved. Thus, Ramadan's claim that the government "provided no information about the witness's condition in late 2021" is unpreserved. (Ramadan Br., 32). And because Ramadan failed to raise that argument before the district court, this Court's review is for plain error. *Skouteris*, 51 F.4th at 673. To establish plain error, Ramadan must show "(1) error (2) that was obvious or clear, (3) that affected his substantial rights and (4) that

32

affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Ramamoorthy*, 949 F.3d 955, 960 (6th Cir. 2020).

### A.    There was no error.

Ramadan stipulated that Prather's age—93 years old at the time in March of 2019—along with his limited ability to travel qualified as "exceptional circumstances" permitting his deposition under Federal Rule of Criminal Procedure 15. (R.130: Stipulation, 2347). Citing Prather's advanced age and the physical conditions that significantly limited his ability to travel, the government then sought to introduce his video deposition at trial.

Federal Rule of Evidence 804(a)(4) provides that a person is unavailable if they "cannot be present or testify at the trial because of death or a then-existing infirmity, physical illness, or mental illness." Unavailability is a case-specific determination that requires a consideration of the witness's "specific symptoms" as well as both the severity and duration of the infirmity. *United States v. Porter*, 886 F.3d 562, 567 (6th Cir. 2018); *Stoner v. Sowders*, 997 F.2d 209, 212–13 (6th Cir. 1993). "It is well established that the infirmity of an elderly witness

which presents him or her from traveling is an 'exceptional circumstance' which justifies the use of deposition testimony at trial." *United States v. Campbell*, 845 F.2d 1374, 1377–78 (6th Cir. 1988).

Aside from the challenges inherent in his advanced age, Prather had serious health issues. He had suffered two heart attacks and was on medication since his most recent one in 2011. He could walk only very short distances—a half or quarter block—without needing to stop and rest. He hadn't left California in three years and hadn't flown for at least four or five years. He couldn't sit on a plane, where he'd be required to stand even though he couldn't stand very long. And because he couldn't lie down to sleep, he wasn't able to sleep in a hotel room. (R.145: Gov't Motion to Admit Testimony, 2459–60; R.145-1: Prather Deposition Tr. 2509–12). Asked how easy it was for him to get around, Prather said "well -- I don't." (R.145-1: Prather Deposition Tr. 2507). Finally, Prather's physician wrote that Prather had been diagnosed with spinal stenosis and that he was "limited in his walking capacity as well as his ability to sit in one place." (R.145-2: Exhibit 2 to Motion, 2520). Given those facts, the district court found that "it would be

34

detrimental to [Prather's] health if he could make it at all" and "that it is not possible for him to come." (R.309: Motion Hrg. Tr., 4643–44).

That determination was a faithful application of Rule 804(a)(4)'s unavailability requirement. Prather himself described the specific symptoms he suffered, how that prevented cross-country travel, and that his conditions had deteriorated with age. And his assessment was backed up by his doctor.

Because trial did not occur until 25 months later, Ramadan now claims on appeal for the first time a lack of evidence that Prather continued to be unavailable for trial. But as this Court pointed out in *Campbell*, there is no need to have a second hearing to confirm that there has *not* been some kind of dramatic improvement or "miraculous rejuvenation" of a witness previously found to be unavailable. *Campbell*, 845 F.2d at 1378; *United States v. Mallory*, 902 F.3d 584, 590 (6th Cir. 2018) (76-year-old witness had chronic conditions). And here, that proposition makes sense. Prather wasn't getting any younger. And the conditions he suffered at 93 years of age were not the type that would typically improve with age. And just as this Court recognized in *Campbell*, by admitting the deposition at trial, "the district judge

35

implicitly found that the exceptional circumstances which initially justified the taking of the deposition[ were] still present." *Campbell*, 845 F.2d at 1378. Given the absence of *any* evidence that Prather enjoyed such a miraculous rejuvenation—especially without a simple prompt from Ramadan suggesting that was the case—the district court was fully justified in not revisiting its unavailability determination. It did not commit any error at all.

Ramadan relies on *Stoner* to suggest that the court erred in its determination that Prather was unavailable. But in that case, although there was a doctor's note indicating that both witnesses were in poor health, the doctor's note failed to offer any specifics, and the witnesses had testified in a deposition near the courthouse the day before trial. *Id*. at 212–13. Here, Prather was thousands of miles away and would have to travel in his condition cross-country while in his 90's. That's nothing like what happened in *Stoner*.

Ramadan's other cases likewise don't support his argument. In *Mallory*, this Court found no abuse of discretion when the district court did not require the government to provide more medical records to confirm the health conditions of the witness after his deposition.

36

*Mallory*, 902 F.3d at 590. And in the other case, this Court similarly affirmed a district court's finding that a doctor's note that a witness would be unable to "tolerate riding in an automobile from Camden to Jackson [both in Tennessee, about an hour apart] due to her postsurgical discomfort" supported a finding of unavailability. *United States v. Bruce*, 142 F.3d 437, *5–6 (6th Cir. 1998) (unpublished). Far from helping Ramadan, those cases support the district court's decision here.

Here, the district court's decision finding Prather unavailable was well within its discretion. There was a case-specific assessment of his physical conditions and abilities that led the court to conclude that Prather could not travel from San Diego to Detroit to testify. The court properly applied Rule 804 and understood that the law required unavailability, not merely inconvenience. It did not rely on any clearly erroneous factual findings or make a clear error of judgment. Accordingly, its finding that Prather was unavailable was not an abuse of discretion. And given the circumstances of Prather's infirmities, the court was not required to update that finding at trial. It committed no error.

**B.    If there was error, it was not so plain or obvious that the district court had the independent duty to *sua sponte* raise the issue.**

Ramadan cannot satisfy any of the other plain-error requirements, either. Even if there was error, Ramadan must show that it was clear or obvious; error "so plain that the trial judge was derelict in countenancing it." *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc) (cleaned up).

Generally, a lack of binding case law normally precludes a finding of plain error, *Skouteris*, 51 F.4th at 673. But here, there is actually authority that the district court did not err. In *Campbell*, this Court affirmed the unavailability determination where the court did not update it at the time of trial. *Campbell*, 845 F.2d at 1378. There, this Court specifically noted that a special supplemental hearing was not required. *Id*. Here, even though the interval between granting the motion and trial was 25 months, given Prather's condition, there was nothing to suggest that the court here was derelict in not investigating if Prather underwent a miraculous rejuvenation. Given the absence of binding case law requiring the court to reopen its earlier decision, it cannot be plain error not to do so.

38

Moreover, since Ramadan bears the burden of establishing plain error, he provided nothing to show that Prather had, in fact, enjoyed such a rejuvenation that the district court would have been required to reverse its unavailability determination and compel him to appear at trial. Thus, he has failed to demonstrate that his substantial rights were affected.

Because Ramadan has failed to demonstrate error, much less clear error that prejudiced him, the district court should be affirmed.

# Conclusion

The district court's judgment should be affirmed.

Respectfully submitted,

Dawn N. Ison
United States Attorney


/s/ William J. Vailliencourt, Jr.
William J. Vailliencourt, Jr.
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9626
William.Vailliencourt@usdoj.gov

Dated: April 24, 2023

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 7,280 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ William J. Vailliencourt, Jr.
Assistant United States Attorney

Dated: April 24, 2023

## Certificate of Service

I certify that on April 24, 2023, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorney of record:

Gary W. Crim, garywcrim@gmail.com

/s/ William J. Vailliencourt, Jr.
Assistant United States Attorney

# Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 2:17-cr-20595:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 41 | Evidentiary Hearing Tr., 01/30/2018 | 405–654 |
| 113 | Superseding Indictment | 2278–281 |
| 130 | Stip and Order for Rule 15 Deposition | 2347–353 |
| 145 | Government Motion to Admit Testimony | 2455–520 |
| 150 | Ramadan Response | 2540–541 |
| 167 | Opinion & Order | 2620–638 |
| 270 | Verdict Form | 4084–85 |
| 299 | Judgment | 4427–434 |
| 300 | Sentencing Tr., 02/28/2022 | 4435–510 |
| 301 | Notice of Appeal | 4511 |
| 309 | Motion Hearing Tr., 11/05/2019 | 4637–666 |
| 312 | Jury Trial Tr., 09/10/2021 | 4749–930 |
| 313 | Jury Trial Tr., 09/13/2021 | 4931–5006 |
| 316 | Jury Trial Tr., 09/17/2021 | 5401–495 |