No. 22-1243

In the
United States Court of Appeals
for the Sixth Circuit

---

## United States of America,

Plaintiff-Appellee

v.

## Yousef Mohammad Ramadan,

Defendant-Appellant

**On appeal from the District Court of Eastern District
of Michigan, Southern Division**

---

## Merit Brief of Appellant

---

Oral Argument Requested

Gary W. Crim
943 Manhattan Avenue
Dayton, Ohio 45406-5141
(937) 276-5770

Counsel for Defendant-Appellant

## *Table of Contents*

*Table of Contents* .......................................................*i*

*Table of Authorities*................................................. *iii*

*Statement in Support of Oral Argument*................................... *1*

*Statement of Jurisdiction*........................................... *1*

*Statement of Issues* ...................................................*2*

    I.   To pass Constitutional muster under the Second
Amendment, the government must show that a gun
regulation is consistent with the Nation's historical
tradition of firearm regulation. Can the government show
that forbidding serial number marring, imposing a
separate federal offense for possessing a stolen firearm,
and prohibiting unregistered sound reducers were
forbidden when the Second Amendment was adopted? .................2

    II.  To use a deposition, the witness must be unavailable.
Here, the Government presented evidence collected in
2019 including the witness preference not to impose on
others and had a doctor's statement about his limitations
for walking and sitting capacity, his diagnosis of spinal
stenosis, his difficulties participating in a trial but provided
no information about the witness's condition in late 2021.
Did the Government establish the witness's
unavailability? ..................................................2

*Statement of the Case* .............................................*3*

*Summary of Argument*........................................... *13*

*Argument*................................................... *14*

    I.   To pass Constitutional muster under the Second
Amendment, the government must show that a gun
regulation is consistent with the Nation's historical
tradition of firearm regulation. Can the government show
that forbidding serial number marring, imposing a
separate federal offense for possessing a stolen firearm,
and prohibiting unregistered sound reducers were
forbidden when the Second Amendment was adopted? ...............14

II. To use a deposition, the witness must be unavailable. Here, the Government presented evidence collected in 2019 including the witness preference not to impose on others and had a doctor's statement about his limitations for walking and sitting capacity, his diagnosis of spinal stenosis, his difficulties participating in a trial but provided no information about the witness's condition in late 2021. Did the Government establish the witness's unavailability? ................................................................. 32

*Conclusion* ........................................................................ *37*

*Certificate of Service* ....................................................... *38*

*Designation of Record* ...................................................... *38*

*Certificate of Compliance* ................................................. *39*

*Table of Authorities*

**Page(s)**

**Federal Cases**

*District of Columbia v. Heller,*
554 U.S. 570 (2008)........................................................ 15, 16, 21, 26

*Henderson v. United States,*
568 U.S. 266 (2013)................................................................ 18

*Konigsberg v. State Bar of Cal.,*
366 U. S. 36 (1961)............................................................... 16

*Maryland v. Craig,*
497 U.S. 836 (1990)............................................................... 32

*McDonald v. City of Chicago,*
561 U.S. 742 (2010)............................................................ 15, 16

*Molina-Martinez v. United States,*
578 U.S. 189 (2016)............................................................... 18

*N.R.A. v. A.T.F.,*
700 F.3d 185 (5th Cir. 2012)................................................. 27, 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
142 S. Ct. 2111 (2022)....................................................... *passim*

*Stimmel v. Sessions,*
879 F.3d 198 (6th Cir. 2018)..................................................... 15

*Stoner v. Sowders,*
997 F.2d 209 (6th Cir. 1993).................................................... 34

*Tyler v. Hillsdale Cty. Sheriff's Dep't,*
837 F.3d 678 (6th Cir. 2016).................................................... 15

*United States v. Booker,*
644 F.3d 12, 24 (1st Cir. 2011) ................................................ 27

iii

*United States v. Bruce,*
No. 96-6590/96-6591, 1998 U.S. App. LEXIS 6643 (6th Cir.
Mar. 31, 1998) ............................................................................ 34

*United States v. Gardiner,*
463 F.3d 445 (6th Cir. 2006) ................................................... 17

*United States v. Greeno,*
679 F.3d 510 (6th Cir. 2012) ................................................... 15

*United States v. Kingsley,*
241 F.3d 828 (6th Cir. 2001) ................................................... 17

*United States v. Mallory,*
902 F.3d 584 (6th Cir. 2018) ............................................. 35, 36

*United States v. Martinez,*
588 F.3d 301 (6th Cir. 2009) ................................................... 33

*United States v. Nunley,*
29 F.4th 824 (6th Cir. 2022) ................................................... 17

*United States v. Reed,*
167 F.3d 984 (6th Cir. 1999) ................................................... 33

*United States v. Salgado,*
250 F.3d 438 (6th Cir.2001) .................................................... 33

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) ................................................... 27

## Federal Statutes

18 U.S.C. § 922 ................................................................ *passim*

18 U.S.C. § 3231 ....................................................................... 1

26 U.S.C. § 5861(d) .............................................................. 6, 30

28 U.S.C. § 1291 ....................................................................... 1

Federal Firearms Act., 52 Stat. 1250 ................................. 25, 26, 29, 30

## Rules

FED. CRIM. R. 15.................................................................... 7, 32

FED. EVID. R. 804 ............................................................ *passim*

## Constitutional Provisions

Second Amendment.................................................................... 2

U.S. CONST. amend. II ..................................................... *passim*

U.S. CONST. amend. VI........................................................... 14

## Other Authorities

Adam Winkler, *Heller's Catch-22,* 56 UCLA L. Rev. 1551, 1563
(2009)............................................................................... 29

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32
Harv. J. L. & Pub. Pol'y 695, 708 (2009) ............................. 29

Carlton F.W. Larson, *Four Exceptions in Search of A Theory:
District of Columbia v. Heller and Judicial Ipse Dixit*, 60
Hastings L.J. 1371, 1376 (2009) ........................................ 28

Lawrence Rosenthal, *The Limits of Second Amendment
Originalism and the Constitutional Case for Gun Control*............... 29

Nelson Lund, *The Second Amendment, Heller, and Originalist
Jurisprudence,* 56 UCLA L. Rev. 1343, 1357 (2009)........................ 29

Robert H. Churchill, *Gun Regulation, the Police Power, and the
Right to Keep Arms in Early America: The Legal Context of
the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n. 11
(2007)................................................................................ 28

5 WEINSTEIN'S FEDERAL EVIDENCE § 804.03 (2021) ................................ 32

*Statement in Support of Oral Argument*

This Court should hear oral argument because the issues raised require explanation beyond the realm of a written brief. Oral argument will help this Court's decision-making process, so Appellant asks this Court to grant oral argument under the Rules of the Sixth Circuit, R. 34.

*Statement of Jurisdiction*

18 U.S.C. § 3231 gave the Federal District Court, Eastern District of Michigan, subject-matter jurisdiction over Defendant upon filing the Indictment on September 7, 2017. Indictment, R. 10, Page ID # 25.

28 U.S.C. § 1291 gives this Court appellate jurisdiction over final orders in criminal cases. Jurisdiction rests upon the Notice of Appeal filed on March 24, 2022, R. 301, Page ID # 4511, from the sentence imposed on February 28, 2022, and reduced to judgment on March 14, 2022, Judgment, R. 299, Page ID # 4427.

*Statement of Issues*

I.   To pass Constitutional muster under the Second Amendment,
     the government must show that a gun regulation is consistent
     with the Nation's historical tradition of firearm regulation. Can the
     government show that forbidding serial number marring, impos-
     ing a separate federal offense for possessing a stolen firearm,
     and prohibiting unregistered sound reducers were forbidden
     when the Second Amendment was adopted?

II.  To use a deposition, the witness must be unavailable. Here, the
     Government presented evidence collected in 2019 including the
     witness preference not to impose on others and had a doctor's
     statement about his limitations for walking and sitting capacity,
     his diagnosis of spinal stenosis, his difficulties participating in a
     trial but provided no information about the witness's condition in
     late 2021. Did the Government establish the witness's unavaila-
     bility?

*Statement of the Case*

Yousef Mohammad Ramadan appeals his conviction and sentence from the District Court of Eastern District of Michigan, Southern Division.

## A. Incident at Detroit International Airport

The origins of the case go back to an incident at the North Terminal of the Detroit International Airport on August 15-16, 2017, as Ramadan and his family attempted to leave for Palestine. An automated system triggered on an item in one of Ramadan's bags, an export item that needed some documentation. Tr., R. 312, Page ID ## 4793-99. A domestic flight would have required no paperwork. Tr., R. 312, Page ID ## 4802. Finding no documentation, the issue was kicked up to Customs and Boarder Protection ("CBP"). Tr., R. 312, Page ID ## 4798-99.

As Ramadan went by the ticketing gate, a CBP officer checked his passport and inquired about Ramadan's ultimate destination, who he was traveling with, how long they would be gone, and how much currency he was carrying. Ramadan reported that he was traveling to Palestine, that he did not know how long he was staying, and that he had about $3,000. Tr., R. 312, Page ID ## 4807. A little later planeside in

3

the jetway, the CBP agent inquired of Ramadan about what was in his luggage. Ultimately Ramadan, his spouse, and two young children were removed from the plane and taken to the Federal Inspection Station. Tr., R. 312, Page ID ## 4810-12.

The CBP agents attempted to examine Ramadan's iPhone, his computer, portable hard drives, and memory cards. Tr., R. 312, Page ID ## 4817-20. They subjected Ramadan to a wide-ranging inquiry that went beyond the export item without the required paperwork; he was asked about his firearms and their location. Later in the early morning, Ramadan told officers that he would take them to his storage locker where he had stored his guns but later refused and said that the firearms were not in the storage locker but with an unidentified friend. Ramadan was handcuffed because the officers belived that he was aggressive amd agitated when asked about providing his passcode to his phone. Tr., R. 312, Page ID ## 4828-53. Ramadan estimated that he left the airport fourteen or fifteen hours after he had arrived. Opinion and Order Denying Defendant's Motions to Suppress, etc., R. 110, October 25, 2018, Page ID # 2222, 2238.

The Government has not charged Ramadan with any crime related to the items taken at the airport on the night of August 15-16, 2017.

## B. *Subsequent Investigation and criminal charges*

The FBI identified the Devon Self Storage, and on August 23, 2017, FBI Agents executed a search warrant for the unit in Ramadan's spouse's name. Tr., R. 312, Page ID # 4880. There were concerns that Mr. Ramadan attempted to travel with items that were export controlled, as well as inconsistent statements that he made regarding firearms and the potential possession of a storage locker. Tr., R. 312, Page ID ## 4866. FBI Agents seized several firearms. Three items gave rise to the charges: a Jennings j-22 pistol, Exhibit 12; a Ruger MK, Exhibit 13; and a home-made silencer, Exhibit 15. Tr., R. 312, Page ID ## 4897-. Tr., R. 312, Page ID ## 4899, 4888, 4896. Other firearms seized did not lead to charges: Exhibit 16, Tr., R. 312, Page ID # 4906; Exhibit 19, Page ID # 312, Page ID # 4919; Exhibit 20, Tr., R. 213, Page ID # 4919.

On August 25, an agent filed a complaint charging possessing a firearm with an obliterated serial number, 18 U.S.C. § 922(k). Criminal

Complaint, R. 1, August 25, 2017, Page ID # 1. Ramadan was arrested on that day and made his First Appearance the next day. Ramadan appeared for a detention hearing on August 29, where he consented to detention pending trial. Consent Order of Detention, etc., R. 9, August 29, 2017, Page ID # 24. Ramadan would spend the next forty-one months in federal custody. Order Setting Conditions of Release, R. 221, January 15, 2021, Page ID # 3650.

The Grand Jury indicted Ramadan on two counts of possession of a firearm with an obliterated serial number: Count One for the Jennings J-22 and Count Two for the Ruger Mk. II 22. Indictment, R. 10, September 9, 2017, Page ID # 25. Over a year later, the Grand Jury issued a Superseding Indictment, with three counts: Count One included possession of a firearm with an obliterated serial number for both pistol, 18 U.S.C. § 922(k); Count Two charged possession of a stolen firearm, the Jennings pistol, 18 U.S.C. § 922(j); and Count Three charged possession to receive or possess a firearm not registered to him in the National Firearms Registration and Transfer Record, 26 U.S.C. § 5861(d). Ramadan went to trial on the charges in the Superseding Indictment.

6

## C. *Pretrial proceedings*

### i. *Motion to Suppress*

In late October 2017, Ramadan filed motions to suppress the evidence derived from the items seized at the airport and derived from the statements Ramadan made at the airport. Motion to Suppress the Fruits of the Search of Electronic Devices, R. 19, October 25, 2017, Page ID # 44, and Motion to Suppress Statements and Their Fruits, R. 20, October 25, 2017, Page ID # 203. After several days of hearing, one year to the day, the District Court overruled the motions in a fifty-three-page opinion. Opinion and Order Denying, etc., R. 110, October 25, 2018, Page ID ## 2222-74.

### ii. *Deposition of Phillp Prather*

Under FED. CRIM. R. 15, the parties agreed to taking the deposition of Philip Prather. The parties also agreed:

> The parties agree that Philip Prather's age, 93 years old, and his limited ability to travel qualify as exceptional circumstances under Rule 15(a)(l), and that this deposition best serves the interest of justice.

Stipulation for Rule 15 Deposition, R. 130, March 27, 2019, PageID # 2347. The deposition started at 9:54 a.m. and concluded at 10:48 a.m.

7

Videotaped Deposition of Phillip R. Prather. Tr., R. 145-1, Page ID ## 2466, 2517.

Prather indicated that a Hispanic employee had cleaned the carpet in Prather's home in San Diego, California. Tr., R. 145-1, Page ID # 2507. Prather testified that his Jenner pistol was taken around that time. Prather kept the pistol at his house in Mission Beach, San Diego, California, in a drawer next to his bed:

> Q. Now, Mr. Prather, do you still own that firearm?
> A. No.
> Q. Why not?
> A. It was presumably stolen.
> Q. Now, you say, "Presumably stolen." Can you tell us about that? What do you mean?
> A. Well, it disappeared. And I—I don't know how long, whether it was a week or two weeks or whatever, that I noticed it was gone.
> Q. So at some point you had it in your house?
> A. Yes.
> Q. And where was it stored?
> A. In a drawer by the side of the nightstand by the side of the bed.
> Q. And then at some point, you noticed that it was gone?
> A. Yes.
> Q. And approximately how long from—approximately how long ago was that? Do you remember when?
> A. To this point until then?
> Q. From this point.
> A. Well, I'm kind of going by that thing there.
> Q. To your recollection. Do you remember when it was—when you noticed it was missing?
> A. Five, six, seven. No, I'm not sure.

Videotaped Deposition of Phillip R. Prather. Tr., R. 145-1, Page ID

## 2475-76.

Prather had a premonition:

Q. Okay. When you first noticed that it was missing, do you
know where it might have gone, or did you know at the time?
A. It a premonition that—pretty sure, but not absolutely certain.
Q. What was your premonition?
A. That it—that it—that it was stolen when I had that—that
carpet cleaned, that the only guy that was in the bedroom,
and it was, I noticed, sometime after that, that it was gone. So
I presumed that it was taken by him.

Videotaped Deposition of Phillip R. Prather. Tr., R. 145-1, Page ID

## 2476. Prather did not identify the company but identified one of his

checks made out to a cleaning service on a day that matched records

from Ramadan's employer showing Ramadan at Prather's address. Ex-

hibit 74, p. 108. Prather Deposition, Tr., R. 145-1, Page ID ## 2477-79.

After inquiries about the pistol, the Government inquired into Pra-

ther's health. ██████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████ did



The Government moved to admit the deposition. R. 145, Government's Motion to Admit Video Deposition In Lieu of Live Testimony, August 20, 2019, Page ID # 2455. The Government's filing included the transcript of the deposition, R. 145-1, Page ID # 2465. The Court held a hearing. Transcript of November 5, 2019, Tr., R. 309, Page ID # 4641. The Motion also included an attachment, a brief statement by Prather's physician:



Other Status Report, R. 145-2, August 20, 2019, Page ID # 2520.

The motion related also related surgery for his back:

Motion to Admit, etc., R 145, Page ID ## 2569. The motion contained no

reference to where in the deposition surgery was discussed, and Counsel

cannot locate any references in the deposition transcript to "surgery."

At the hearing, the defense relied on its Ramadan's constitutional

rights:

> As the Court is well aware, Mr. Ramadan has a right to con-
> front witnesses. We are asking that that right not be taken from
> him. Mr. Prather, based upon my last contact with him, appeared
> to be healthy for a 92–93-year-old man. I understand there will
> be some inconvenience in terms of him traveling, but I don't
> think that that inconvenience rises to the level of unavailability.

Transcript of Motion Hearing, November 5, 2019, R 309, Page ID ##

4640-41.

In ruling on the motion, the District Court announced its decision at

the November 8, 2019, hearing.

> THE COURT: All right. The Court has reviewed this matter,
> and what we have is a witness who is allegedly unable to come.
> Supporting that testimony about being unable to come, we know
> that he's 93 or 94 years old, walks with a cane, apparently hasn't
> flown in some time because of his physical condition, and appears
> that this would be not only a great inconvenience, because incon-
> venience is not the standard, but it would be detrimental to his
> health if he could make it at all.

So the Court denies (sic) the motion. I've reviewed the tran-
script. I don't know what else there would be that you could even
ask him, but obviously, the defendant has a right to have the wit-
nesses come, if at all possible. And the Court here finds that it is
not possible for him to come, and therefore, pursuant to Rule
804(b)(1), he may testify via video.

Transcript of Motion Hearing, November 5, 2019, R 309, Page ID

## 4643-44. The Opinion and Order provided no further justification:

Next, for the reasons stated on the record at the November 5,
2019 hearing on this matter, the Court GRANTS the Govern-
ment's August 20, 2019 motion to admit video deposition in lieu
of live testimony (Dkt. 145).

Opinion and Order Denying Defendant's Motion to Dismiss, etc., R. 167,

January 14, 2020, Tr., R. 167, Page ID # 2620.

*Summary of Argument*

The charges involve federal regulation of firearms, regulations that the Government cannot trace back to the time of adoption of the Second Amendment. Neither the federal government nor the state governments criminalized possession of a firearm with an obliterated serial number, separately criminalized possession of a stolen firearm from other stolen property, criminalized possession of unregistered firearms. Thus, the charges against Ramadan cannot pass muster under the Second Amendment, as now interpreted by the United States Supreme Court.

FED. EVID. R. 804 provides for using former testimony when a witness is unavailable, not when the witness is inconvenienced. The witness who provided the only testimony for parts of the linkage of Ramadan to the gun in California.

13

*Argument*

I. To pass Constitutional muster under the Second Amendment, the government must show that a gun regulation is consistent with the Nation's historical tradition of firearm regulation. Can the government show that forbidding serial number marring, imposing a separate federal offense for possessing a stolen firearm, and prohibiting unregistered sound reducers were forbidden when the Second Amendment was adopted?

Ramadan was sentenced March 14, 2022. On June 23, 2022, the Supreme Court of the United States rendered its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* marked a dramatic shift in post-Heller Second Amendment jurisprudence.

If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted during the founding era, when the Second Amendment was adopted.

14

Following *District of Columbia v. Heller*, 554 U.S. 570 (2008), and
*McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010), this Court—and
other circuits—analyzed Second Amendment challenges with a two-step
process. The first step asked whether the challenged law burdens con-
duct that falls within the scope of the Second Amendment right, as his-
torically understood. *United States v. Greeno*, 679 F.3d 510, 518 (6th
Cir. 2012). If the Government demonstrated that the challenged statute
regulates activity fell outside the scope of the Second Amendment, then
the analysis stopped.

But if the statute did burden Second Amendment conduct, then the
second step inquiry into the strength of the government's justification
for restricting or regulating the exercise of Second Amendment rights.
This Court employed intermediate scrutiny. *Tyler v. Hillsdale Cty.
Sheriff's Dep't*, 837 F.3d 678, 720 (6th Cir. 2016); *Stimmel v. Sessions*,
879 F.3d 198, 206 (6th Cir. 2018) The United States Supreme Court re-
jected that approach, instructing courts to only consider "constitutional
text and history." *Bruen*, 142 S. Ct. at 2128-29.

*Bruen* expressly disavowed the lower courts' two-step framework, following *District of Columbia v. Heller*, 554 U.S. 570, 592, 624 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010), saying,

> Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961).

*Bruen*, 142 S. Ct. at 2126.

Under the new framework mandated by *Bruen*, the Government cannot charge Ramadan with possessing a firearm which had the manufacturer's serial number removed under 18 U.S.C. § 922(k). Possessing a stolen firearm was never a separate federal crime until 1938 and  using an unregistered sound suppresser was not a crime. Because possession of a firearm comes within the Second Amendment's "plain text," Ramadan's conduct is presumptively protected. The Government cannot rebut that presumption. Manufacturer serial number requirements and removal prohibitions were only adopted in 1968 and were equally

unknown to the founding generation. So defendant's indictment must be dismissed.

### A. The standard of review

Ramadan did not challenge his charges on Second Amendment grounds in the District Court. Thus, this Court reviews his charges under the plain error standard. To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Nunley*, 29 F.4th 824, 833 (6th Cir. 2022); *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006); *United States v. Kingsley*, 241 F.3d 828, 835-36 (6th Cir. 2001).

### i.  An error occurred in the district court

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), establishes the inability of the Government to prevail under the Second Amendment.

## ii. *The error was obvious or clear*

The language of *Bruen* makes it clear that the government cannot establish that forbidding serial number marring, prohibiting unregistered sound reducers, and imposing a separate federal offense for possessing a stolen firearm were solutions used in 1791. The Supreme Court has held that in direct appeal cases, the reviewing court must determine that the error was plain at the time of review. *Henderson v. United States*, 568 U.S. 266, 277 (2013)

## iii. *The error affected defendant's substantial rights*

Dismissing the counts would clearly affect Ramadan's substantial rights. To prevail, a defendant need show a reasonable probability that, but for the error, the outcome of the proceeding would have been different. *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). Eliminating the counts would change the result here.

## iv. *This adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings*

The unfairness of convicting a person of something that the Second Amendment protects is readily apparent.

**B. *Bruen* replaced a means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

This standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Bruen,* 142 S. Ct. at 2126. If it does, then the Constitution presumptively protects that conduct. Answering this threshold question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause, i.e., a special need for self-protection distinguishable from that of the general community." *Bruen,* 142 S. Ct. at 2122-23.

As the Court explained, to rebut the presumption of unconstitutionality, *Bruen* held that the government may not simply posit that a regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command. *Bruen,* 142 S. Ct. at 2126. This test requires courts to consider whether historical precedent evinces a comparable tradition of regulation. If no such tradition exists, then the statute being challenged

19

is unconstitutional. *Bruen,* 142 S. Ct. at 2132. And insofar as there are multiple plausible interpretations of an ambiguous historical record, courts must favor the one that is more consistent with the Second Amendment's command. *Bruen,* 142 S. Ct. at 2141 n.11.

The Court explained that constitutional rights are enshrined with the scope they were understood to have when the people adopted them. *Bruen,* 142 S. Ct. at 2136. The relevant historical tradition for a federal gun regulation is that which existed in 1791, when the courts may look to the tradition of firearms regulation before and even after the founding period, but they should do so with care. *Bruen,* 142 S. Ct. at 2131-32.

The Court cautioned that historical evidence that long predates 1791 may not illuminate the scope of the Second Amendment right if linguistic or legal conventions changed in the intervening years. Courts should not rely on an ancient practice that had become obsolete in England when the Constitution adopted and never was acted upon or accepted in the colonies. *Bruen,* 142 S. Ct. at 2136.

But the farther forward in time one goes from 1791, the less probative historical evidence becomes. As the Supreme Court recognized in

*Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources. Evidence from the mid-to late-19th-century provides little insight into the meaning of the Constitution in 1791. Courts should therefore credit such history to the extent it confirms prior practice with which it is consistent, but should otherwise afford it little weight. Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. To the extent later history contradicts what the text says, the text controls. *Bruen,* 142 S. Ct. at 2137.

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the proper cause requirement, the state's statute violated the Second Amendment. *Bruen,* 142 S. Ct. at 2138-56. In concluding that, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it staked certain guideposts for lower courts to follow. The Court said, for instance, that the historical inquiry will be fairly straightforward:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a

distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen,* 142 S. Ct. at 2131. If the Founders themselves could have adopted a particular regulation to confront a perceived societal problem, but did not do so, then that regulation is unconstitutional today. *Bruen,* 142 S. Ct. at 2131.

In other cases, challenged statutes will implicate unprecedented societal concerns or dramatic technological changes, which may require a more nuanced approach. *Bruen,* 142 S. Ct. at 2132. When firearms pose regulatory challenges that differ from those that preoccupied the Founders in 1791, the historical inquiry that courts must conduct will often involve reasoning by analogy. Courts should use analogical reasoning when confronting present-day firearm regulations that were unimaginable at the founding.

Deciding whether a historical regulation is a proper analog for a distinctly modern firearm regulation requires a determination of whether

the two regulations are relevantly similar. The Court in *Bruen* declined to provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, but it did identify at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. *Bruen,* 142 S. Ct. at 2132-33. Whether modern and historical regulations impose a comparable burden on the right of armed self-defense; whether that burden is comparably justified. *Bruen,* 142 S. Ct. at 2133.

The Court also stressed the limits of reasoning by analogy:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Bruen,* 142 S. Ct. at 2133. (emphasis in original).

Whether based on distinctly similar precursors or merely historical analogs, the comparable tradition of regulation must be robust, requiring a well-established and representative historical analog. *Bruen,* 142

S. Ct. at 2137. A governmental practice can guide courts' interpretation of an ambiguous constitutional provision if that practice has been open, widespread, and unchallenged since the early days of the Republic. A handful of outlier statutes or cases from a few outlier jurisdictions do not make out a historical tradition. *Bruen,* 142 S. Ct. at 2153, 2156. The Court expressed doubt, for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Bruen,* 142 S. Ct. at 2142.

Finally, *Bruen* emphasized—repeatedly—that the burden falls on [the government] to show that a statute follows this Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2135. The government bears the burden of affirmatively proving that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen,* 142 S. Ct. at 2127, 2130, 2141 n.11 But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement follows the Second Amendment's text and historical scope. Consistent with the principle of party presentation, courts may decide a case based on the

historical record compiled by the parties. *Bruen,* 142 S. Ct. at 2130 n.6. Courts do not have to sift the historical materials for evidence to sustain a statute. That is the government's burden. *Bruen,* 142 S. Ct. at 2149-50. The burden rests with the government to establish the relevant tradition of regulation. *Bruen,* 142 S. Ct. at 2149 n.25.

### C. The government cannot carry its burden of establishing a historical tradition of putting serial numbers on firearms, prohibiting unregistered sound reducers, and imposing a separate offense for possessing stolen firearms.

The Federal Firearms Act required registration and licensing of firearm manufactures and dealers, prohibited some felons from possessing firearms, which included silencers, and forbad transporting stolen firearms and ammunition. 52 Stat. 1250-51

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is easy in Mr. Ramadan's case. The Second Amendment protects the right of the people to keep and bear arms. Possession of a firearm, the conduct proscribed by § 922(g)(1), easily qualifies as keeping and bearing arms. See

*Heller*, 554 U.S. at 628-29 (holding statute that barred possession of handguns in the home unconstitutional).

Because the Second Amendment's plain text covers Mr. Ramadan's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. *Bruen's* position here actually follows the premise *Heller* presented back in 2008–which is that all modern gun regulations were adopted subject to rational basis review of what is now an unconstitutional interpretation of the Second Amendment (that its protections only extended to citizens in organized militia service). To rebut the presumption of constitutional protection, in lieu of means-end scrutiny– the government must now establish that § 922(k) is "consistent with this Nation's historical tradition of firearm regulation." The "general societal problem" that § 922(k) is one "that has persisted since the 18th century." *Bruen,* 142 S. Ct. at 2131. § 922(k) is unconstitutional unless the government shows a robust tradition of distinctly similar historical regulations as of 1791, when the Second Amendment was ratified. The government cannot make that showing.

What is today § 922(k) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons

from receiving firearms. The statute "covered only a few violent offenses," prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). Not until 1961 did Congress amend the statute to prohibit "possession by all felons." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). Thus 18 U.S.C. § 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—a century and a half after adoption of the Second Amendment. Regulations of such recent vintage cannot establish a historical tradition unless they confirm earlier practice. *Bruen*, 142 S. Ct. at 2137. In *Bruen* the Court said it would not even address the 20th-century historical evidence brought to bear by respondents or their amici, since such evidence does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence. *Bruen*, 142 S. Ct. at 2154 n.28.

Even if the Court broadens its focus to consider state statutes too,18 U.S.C. § 922(k) bears little resemblance to laws in effect when the Second Amendment was ratified. *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws

pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I. It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. No

28

other state passed a felon-disarmament law until 1923. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). See also Adam Winkler, *Heller's Catch-22,* 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the founding."); Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence,* 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control,* 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); accord *N.R.A.*, 700 F.3d at 197 ("[A] strictly originalist argument for. .. bans on firearm possession by felons. .. is difficult to make.").

There was no historical tradition, circa 1791, of gun regulations distinctly similar to the counts Ramadan faced: 18 U.S.C. § 922(k), for obliterated serial numbers; 18 U.S.C. § 922(j), for possessing a stolen

firearm as a separate offense; and for an unregistered firearm, 26 U.S.C. § 5861(d). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922 to confront the perceived societal problem posed by violent felons. But they declined to do so, and that inaction indicates various provisions under 18 U.S.C. § 922 are unconstitutional." *Bruen*, 142 S. Ct. at 2131.

Even if analogical reasoning were appropriate, however, it would not aid the government. Defendant is unaware of a historical tradition of founding-era statutes forbidding obliterating serial numbers on firearms, prohibiting unregistered sound reducers, and imposing a separate offense for possessing stolen firearms relevantly, now forbidden by various subsections 18 U.S.C. § 922. Treating the theft of firearm separately from other property by criminalizing moving a stolen firearm across state lines did not become a federal offense until the passage of the Federal Firearms Act., 52 Stat. 1250 in 1938. *Bruen*, 142 S. Ct. at 2132. The government therefore cannot shoulder its heavy burden of rebutting the presumption of unconstitutionality for all three of the counts against Ramadan.

Thus, the Counts against Ramadan should be dismissed.

.

II. To use a deposition, the witness must be unavailable. Here, the Government presented evidence collected in 2019 including the witness preference not to impose on others and had a doctor's statement about his limitations for walking and sitting capacity, his diagnosis of spinal stenosis, his difficulties participating in a trial but provided no information about the witness's condition in late 2021. Did the Government establish the witness's unavailability?

"Unavailability is the all-important condition precedent to the admission of hearsay statements under the exceptions that are included in Rule 804(b)." 5 WEINSTEIN'S FEDERAL EVIDENCE § 804.03 (2021). A general statement is insufficient. When the question is one of the health of the witness, there must be "the requisite finding of necessity" which is "case specific" to dispense with confrontation in open court. *Maryland v. Craig*, 497 U.S. 836, 855 (1990).

FED. CRIM. R. 15 provides for the taking depositions under "exceptional circumstances and in the interest of justice." This rule does not resolve the evidentiary question of whether the deposition is admissible in a criminal trial. resolves such questions. Such issues are resolved by FED. EVID. R. 804(b), which provides:

(b) The Exceptions. The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
   (1) Former Testimony. Testimony that:

32

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
(B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

## A.  The standard of review

"In reviewing a trial court's evidentiary determinations, this court reviews de novo the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Martinez*, 588 F.3d 301, 309 (6th Cir. 2009); *United States v. Salgado*, 250 F.3d 438, 451 (6th Cir.2001); *United States v. Reed*, 167 F.3d 984, 987 (6th Cir. 1999)

## B.  To present a videotape of a deposition instead of live testimony, the proponent must show that the witness was unavailable.

Availability is covered by FED. EVID. R. 804, which provides in part:

(a) Criteria for Being Unavailable. A declarant is considered to be unavailable as a witness if the declarant:
. . . .
(4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or

33

This Court discussed a general medical opinion as justification for using depositions of a husband and wife in *Stoner v. Sowders*, 997 F.2d 209, 211 (6th Cir. 1993), where the doctor said in an affidavit only that they were in extremely poor physical health and that the physical health of these patients could be impaired if they were subjected to the rigors of sitting through a jury trial. This affidavit alleviated the trial judge's earlier concerns, and she allowed the deposition to be used. This Court described the process:

> They were "unavailable" only in the sense that they preferred not to testify and were in poor health according to the doctor's affidavit.

*Stoner v. Sowders*, 997 F.2d at 212. Prather discussed his personal preferences, preferences that led him to refuse help in travel. The doctor's statement here does not demonstrate unavailability that meets the requirements of FED. EVID. R. 804.

This is not an impossible burden.

In *United States v. Bruce*, No. 96-6590/96-6591, 1998 U.S. App. LEXIS 6643, at *15-16 (6th Cir. Mar. 31, 1998), the witness had abdominal surgery eleven days before the trial. The government produced a document from the witness's doctor, informing the court that the

witness would not be able to tolerate riding in an automobile to court due to postsurgical discomfort. This Court affirmed the judgment using a video deposition.

In *United States v. Mallory*, 902 F.3d 584, 589 (6th Cir. 2018), the conviction rested on a videotaped deposition of a co-conspirator. About six months after the indictment, the government deposed the co-conspirator, who was seventy-six years old and suffering from several debilitating conditions, including lumbar disc disease, diabetes, and recurring bladder cancer. The pain in his back—where two vertebrae were disintegrating—was severe. So, the government, concerned that the witness might not live until trial, sought to preserve his testimony by deposing him. The deposition took place at a federal courthouse where the witness resided. After the deposition, the witness's health further deteriorated. He was admitted to the hospital twice—first for hematuria (blood in his urine), and second when he experienced acute renal failure (serious kidney malfunction). He was also diagnosed with dementia. These and his other chronic conditions rendered him homebound and unable to safely travel. The District Court granted the government's request to play the videotape of the deposition, and this Court found tha

the District Judge did not abuse his discretion. *Mallory*, 902 F.3d at 591-92.

FED. EVID. R. 804 requires the government show a witness to be unavailable, not that the witness is inconvenienced.

### C. The Government has shown only that traveling to testify was inconvenient to the witness.

The District Court reviewed the deposition and the motion. The information collected in 2019, did not support a finding of unavailability for trial two years later, in 2021.

The Government presented considerable evidence that Prather did not want to travel but very limited evidence that he was unable to travel. The only medical evidence was from an April 11, 2019 report, a report based on a August 2018 examination. ████████████ ████████████████████████████ █████████████████████████████ ████████████████████ The information presented to the District Court supported only a finding that testifying would be inconvenient. Prather's testimony shows that his preference is not to inconvenience others in order to travel.

36

Thus, the Government failed to meet the prerequisite for using a deposition instead of live testimony.

### Conclusion

Thus, this Court should reverse the conviction and dismiss the case.

s/Gary W. Crim

GARY W. CRIM (0020252)
943 Manhattan Avenue
Dayton, Ohio 45406-5141
(937) 276-5770

Attorney for Yousef Mohammad Ramadan

37

*Certificate of Service*

On January 23, 2023, I certify that I electronically filed this Merit Brief of Appellant with the Clerk of Court using the CM/ECT system, thus forwarding the document electronically to Counsel of record.

*s/Gary W. Crim*

*Designation of Record*

Under Sixth Circuit Rule 30(g), Appellant designates these filings in the District Court record as items to be included in the record.

| Description of Entry | Date | Record Entry No. | PageID |
|---|---|---|---|
| Indictment | 09/07/2017 | 10 | 0025 |
| Judgment | 03/14/2022 | 299 | 4427 |
| Notice of Appeal | 03/24/2022 | 301 | 4511 |
| Excerpt from Transcript of Motion Hearing (November 5, 2019) | 08/22/2022 | 309 | 4637-44 |
| Opinion and Order Denying, etc. | 01/24/2020 | 167 | 2620 |

*Certificate of Compliance*

I certify that this brief contains 6,986 countable words as deter-
mined by Microsoft Word used to generate this document.


*s/Gary W. Crim*